UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JIMMY LLOYD ALEXANDER,

Petitioner,

v.

DANIEL E. CUEVO,

Respondent.

Case No. 21-cv-05232-WHO (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

**INTRODUCTION**

Petitioner Jimmy Lloyd Alexander seeks federal habeas relief from his California state convictions for kidnapping to commit oral copulation, rape, sodomy and other crimes. None of his claims has merit. His conviction for kidnapping was supported by sufficient evidence of force or fear; his claims that certain expert testimony was irrelevant or prejudicial and that the trial court should have given an instruction *sua sponte* fail to state a claim for relief; his sentence of 175 years to life does not violate the Eighth Amendment; and the trial court's instruction on kidnapping was a correct statement of state law and is not susceptible to Alexander's interpretation that a juror could find him guilty of kidnapping through an act of fraud or deceit. His petition for habeas relief is DENIED.

**BACKGROUND**

In 2017, Alexander was convicted by a Monterey County Superior Court jury of kidnapping to commit oral copulation, rape, and sodomy; two counts of forcible rape; two counts of forcible sodomy; four counts of forcible oral copulation; and second degree

robbery.  (Ans., State Appellate Opinion, Dkt. No. 30-21 at 3, 16.)[1]  The jury also found true various sentencing enhancements.  (*Id.* at 16.)  A sentence of 175 years to life in state prison was imposed.  (*Id.*)  Alexander's attempts to overturn his state convictions in state court were unsuccessful.  This federal habeas petition followed.

The state appellate court summarized the facts as follows:

## 2.    The Trial

### a.    Victim's Testimony

When victim was six years old, her brother's 14-year-old friend forced her to have oral sex with him.  At the time, victim did not fight back and did not understand what was going on.  Victim later told her parents about what happened.  Victim heard that investigators went to her brother's friend's house, but her brother's friend was still permitted to come over to victim's house after the investigation concluded, making her feel unimportant.  As a result of this incident, victim often felt insecure and was afraid of being alone with men.  She occasionally still thought about what happened to her as a child, and memories of the event made her feel anxious.

Victim, who was 43 years old at the time of Alexander's trial, lived in Salinas with her female fiancée (fiancée) and her mother (mother).  Victim suffered from attention deficit disorder and took Adderall to control her symptoms.  At the time the offenses were committed, victim was taking other medication, including Butalbital, Wellbutrin, Fluoxetine (a generic for Prozac), Xanax, and prescription cough syrup.  Between February 2016 and October 2016, victim used methamphetamine with her fiancée several times a week.  She stopped using methamphetamine because she believed the drugs were not a 'good thing' for her to do and the habit was expensive.

On Saturday, April 14, 2017, victim argued with her brother (brother) at his house.  Victim had taken a Xanax, and brother confronted her about what she was 'on.'  Victim admitted that she had used methamphetamine the year before.  The fight with brother continued to the next day, Saturday, April 15.  Brother came over to mother's house and told victim that he was going to change mother's locks.

Later that afternoon, victim left mother's house to go to her storage unit to retrieve packing boxes.  Victim stopped to buy a meth pipe because she

---

[1] *People v. Alexander*, No. H045599, 2020 WL 2188866, at *1, 8 (Cal. Ct. App. May 6, 2020.)

United States District Court
Northern District of California

wanted to see if she could purchase methamphetamine from someone at the storage unit. She was angry at brother and mother for not being supportive of her sobriety. Victim arrived at the storage unit at approximately 5:00 p.m. and saw that it was closed.

Victim stayed in her car and called over the first person that she saw on the street. Victim asked the man if he could get her some methamphetamine. The man asked victim how much money she had, and victim gave him $20. The man walked away with victim's money and came back with Alexander. The man handed victim a piece of plastic that was almost empty. Victim became angry and asked where the rest of the drugs were.

Alexander disappeared from victim's view for a few minutes, and when she saw him again, he was coming around to the front of her car and was getting inside to sit in the front passenger seat. Victim saw that Alexander had a 6-inch long hunting knife on his right side. Alexander did not directly threaten victim with the knife, and she thought she might have 'accidentally' seen it. Victim felt scared. Alexander told her to drive and instructed her to go to a 99 Cent store. He told victim to pull her car behind the back of the store.

Victim had her cell phone with her, and she made a call to fiancée. Victim spoke with fiancée for approximately two and a half minutes but did not ask for help because she 'froze up.' She remembered that she told fiancée that the storage facility was closed, but she did not mention that there was someone else in the car with her or that she was driving to an unknown destination. Victim's cell phone ran out of power shortly after she called fiancée. After she stopped the car, Alexander pulled out some methamphetamine and told victim to smoke it. Victim did not want to smoke methamphetamine, but she was scared and did as she was told. Victim and Alexander remained in the car, with victim in the driver's seat and Alexander in the passenger's seat.

Alexander told victim to '[l]ook,' and when victim looked in Alexander's direction, she saw that his pants were down and his penis was exposed. Victim asked Alexander what he was doing, and Alexander responded, 'Come on.' Victim told Alexander that she was not interested, she was gay, and she was not a 'crack whore.' Alexander told victim to "'[s]uck [his] dick' 'and put victim's hand on his penis. Victim pulled her hand back, and Alexander again told her to 'suck his dick.'" Victim was scared, so she leaned toward Alexander. Alexander pulled her neck and face down, and victim placed her mouth on his penis for approximately 10 to 15 minutes. Victim repeatedly told Alexander that she was gay. A passerby walked by the car and Alexander told victim that they should leave.

Victim felt scared when she was forced to orally copulate Alexander. She

described that she 'felt like I did when I was a kid [being molested] again having to do that.' She thought about fighting back and running away, but she was afraid.

Victim and Alexander then drove to a pharmacy parking lot. They stayed in the parking lot for approximately 10 minutes. No sexual acts occurred at the parking lot. Alexander told victim that he wanted to find someplace secluded. Next, victim and Alexander drove near a gas station that was located in an industrial area. There were some businesses that were closed off by a gate. Victim recalled that Alexander noticed that one of the gates was closing, and he told her to quickly drive through it to a tractor/trailer area. Alexander then directed victim to park the car. At first, victim and Alexander remained seated in the car. Alexander then got out of the car and stood outside the passenger door. He started spitting on victim's face and forced her to have oral sex with him. Victim and Alexander remained in the area for 10 or 15 minutes. Another passerby walked near the area, and Alexander decided that they should leave because he wanted to find another secluded place.

Victim and Alexander went to the nearby gas station. Alexander told victim to go inside and buy him a beer. Victim told Alexander that she did not have any money, and Alexander would need to give her some if he wanted her to buy him a beer. Victim went inside the store. There were other people inside the store, but she did not ask for help. Victim was 'trying to make sense of everything that was going on and [was] thinking about what [she] could do to safely get out of the situation.' Victim had the 'mindset that [she had] when [she] was a kid . . . was afraid of how [Alexander] might harm [her] somehow.' Victim purchased some water, thinking that she could moisturize her mouth and stop Alexander from spitting in her face. The gas station cashier told victim that her car's headlight was out. At the time, victim felt trapped and terrified. She went outside to turn on the headlights to take a look.

Afterwards, victim and Alexander drove back to the tractor/trailer area. Alexander told victim to put her seat back and to bend over. Victim felt Alexander rub something that smelled like hand sanitizer on her buttocks. Victim asked Alexander what he was doing and told him that 'he wasn't sticking anything up [her] butt.' Alexander replied, 'We're going to do things my way.' Alexander then sodomized victim. Alexander also had victim perform oral sex on him an additional three or four times while they were in the area.

Alexander then directed victim to drive to a hotel. Alexander smoked more methamphetamine while parked in the parking lot, and he also told victim to smoke some more. Alexander told victim to clear out the back seat of her car and to place her belongings in the trunk. While victim was outside moving

the items to the trunk, Alexander came from behind and raped her, putting his penis inside of her vagina. Alexander pushed victim to the ground, and victim landed on her knee. Alexander then told victim to get back into the back seat of the car, and she complied. Alexander attempted to have vaginal sex with victim, but he did not have a full erection. He then told her to roll onto her knees, and he penetrated her anally using some lotion that victim had in the car. Alexander pushed and grabbed victim's head, and she hit her head on the car door several times. Later, victim and Alexander were sitting in the front of the car, and Alexander forced victim to orally copulate him again.

Afterwards, Alexander 'stopped' and said he wanted to get a room. Victim told Alexander that she needed him to leave, and people would be looking for her soon. She also told him that her brother was an attorney who knew police officers. Victim thought that this information might scare Alexander. Victim did not remember if Alexander responded to her statements. They left the hotel and drove back to the gas station that they had left earlier.

At the gas station, victim told Alexander that [s]he needed to leave. At some point, Alexander stepped outside the car. Victim did not drive away because she was afraid, and she felt that she needed Alexander to voluntarily leave. Alexander returned to the car, and victim went inside the gas station. Victim went back to the car to get her insulin because she planned on calling 911 and returned to the gas station. Victim asked the cashier for a phone and told him that she was in an emergency situation because there was someone inside her car. Victim, however, 'froze up' and made no calls. She held the phone to her ear for a second and decided that calling the police might not be the 'best thing.' Victim did not know how long it would take for the police to arrive, and she did not know how suspicious Alexander would become. She was not sure if she would be safe if she made the phone call.

Victim walked back to the car, and Alexander had her drive to a Dollar Store. Victim kept telling Alexander that she needed to let him off somewhere because people would be looking for her. Alexander told her that he was not finished with her yet, and he wanted to 'find a girl on the street . . . to bring in.' Victim interpreted Alexander's comments to mean that he had not ejaculated yet.

Alexander then had victim drive to a grocery store. Victim drove through the parking lot and pulled in front of a house. Victim lied and told Alexander that she lived at the house. Victim told Alexander that he needed to get out of the car because she needed to speak with her fiancée. Victim also told Alexander that he could not be inside the car while she was inside the house. Alexander finally agreed to get out of the car. He took victim's phone as 'security or collateral' to ensure that victim would return. After Alexander got out of the car, victim drove, made a U-turn, and left the area. Victim believed it was

safe to leave Alexander at that location because it was more secluded. Victim thought that if she had left Alexander at the gas station, he could have convinced someone to give him a ride to follow her.

Victim drove home and told fiancée that she had been raped. By that time, it was approximately 1:00 or 1:30 a.m. on Sunday morning. Fiancée suggested that victim go to the hospital. Fiancée also wanted to go to the location where victim dropped Alexander off to see if fiancée could find him because she was 'very angry.' Victim took fiancée back to where she had dropped Alexander off. They did not see him and proceeded to go to the hospital. Victim and fiancée arrived at the hospital at around 2:00 or 3:00 a.m. She spoke with a police officer and underwent a physical rape examination.

Later, victim used fiancée's phone to 'ping' her cell phone. Brother also got involved. Victim was able to locate Alexander, and she took a picture of him outside of a library. She then went to a police station and told officers that she had been raped by Alexander, showing officers the photograph that she had taken.

The entire time that Alexander forced victim to engage in sex acts, victim felt horrified and could not understand what was happening. She did not fight back because she was afraid of what Alexander would do; she did not know if he would harm her physically, hit her, or stab her. Victim did not know what Alexander was capable of. At some point during the night, Alexander burned her finger with a cigarette. Victim suffered from other injuries, including bruises.

When victim first told fiancée, mother, and the police about what had happened with Alexander, she did not disclose that she had intended to purchase drugs from Alexander. She felt ashamed and thought that people might blame her for what happened. Later, victim did not initially tell the district attorney or his investigator that she and Alexander went to the gas station because she was afraid of how the surveillance videos in that area would be interpreted. Victim knew that she did not fight with Alexander and thought the videos would make her look complacent.

**b.      Fiancée's Testimony**

Fiancée and victim had been together for three years. Fiancée introduced victim to methamphetamine, but both fiancée and victim stopped using drugs sometime in October 2016. Fiancée knew someone who sold methamphetamine, and she never purchased drugs on the streets.

On Saturday, April 15, victim got into a fight with brother and mother. Victim

was in an irate mood when she left mother's house, and she told fiancée that she was going to get boxes out of their storage unit. About an hour after victim left, victim called fiancée and spoke to her over the phone. Victim told fiancée that the storage unit was closed. Victim did not indicate that she was in trouble. Fiancée did not think there was something wrong, but she thought that 'there was something in [victim's] voice.'

The next time fiancée spoke with victim was at 1:30 a.m. on Sunday morning. Fiancée had been trying to reach victim that night, but her calls to victim's phone went straight to victim's voicemail. Victim opened the door and had a 'look of terror in her eyes.' Victim's clothes were dirty, and fiancée knew there was something wrong. Victim told fiancée that someone had gotten into her car with a knife, made her drive to different places, including a 99 Cent Store and a hotel, and made her 'perform oral sex with him.' Victim also told fiancée that the man 'tried to sodomize her and rape her.' Fiancée told victim that they should go to a hospital, and victim initially said she wanted to take a shower first. Victim woke up mother, who had been sleeping, told her what happened, and went to the hospital with fiancée.

**c.    Mother's Testimony**

When victim was six years old, mother recalled that victim came home crying one day. After victim calmed down, she told mother that brother's friend had 'put his penis in [her] mouth.' The family went through court proceedings and made arrangements for victim to have counseling.

Mother recalled the argument that she had with victim shortly before the crimes occurred. During the argument, victim told mother that she had used methamphetamine in the past. Brother told mother that she should not let victim or fiancée live with her anymore. At some point in the afternoon, mother noticed that victim had left. Fiancée told mother that victim had left to get boxes from her storage unit.

The next time mother saw victim was at around 1:30 a.m. the next morning. Mother had been sleeping, and victim woke her up. Victim, who was crying and hysterical, told mother, 'I've been raped and sodomized and I've been held in my own car for the last eight hours at knife point.' Mother told victim that she needed to go to the hospital.

**d.    Brother's Testimony**

Brother testified that victim went out to get boxes after their argument that Saturday afternoon. He tried reaching her on the phone afterwards, but she did not respond. The next morning, brother heard from mother about what had happened to victim. Brother helped victim locate her phone. He called

victim's phone number, and a man answered.  Brother and the man had a five or six minute conversation.  The man identified himself by his first name, Jimmy.  Brother also met with police officers at the library after victim located the man who had assaulted her, who she later identified as Alexander.

### e.     The Police Investigation

On April 17, 2017, Officer Masahiro Yoneda responded to a 911 call at a library that was made by victim.  Upon Officer Yoneda's arrival, brother showed Officer Yoneda a picture of Alexander, and Officer Yoneda arrested and detained Alexander.  Alexander had a gray iPhone in his possession.  Officer Yoneda conducted an 'infield show-up' with victim at the police station and asked victim to identify Alexander.  After Officer Yoneda admonished victim about infield show-ups, victim identified Alexander as the man who had raped her.

A sexual assault forensic nurse conducted an examination of victim after she arrived at the hospital at around 12:45 p.m.  There was some delay in beginning victim's examination because she needed to have a CAT scan of her head.  The nurse observed that victim had several large bruises on her body and a cigarette burn.  Victim also complained of head pain.  The nurse conducted a vaginal exam and noted that victim's perihymenal area was raw and red.  Victim also had friction injuries that appeared to have been inflicted within the past 12 to 24 hours, which was consistent with her report of sexual assault.  The nurse collected labial and anal swabs from victim and also took swabs from Alexander, who she also examined.

A criminalist with the Department of Justice analyzed victim's and Alexander's blood and urine.  Alexander's urine tested positive for methamphetamine and amphetamine, and his blood tested positive for methamphetamine.  Victim's urine tested positive for methamphetamine and amphetamine, metabolites of the anti-depressant or smoking-cessation drug Wellbutrin, a synthetic opioid-type drug found in over-the-counter drug syrups, Prozac, an antihistamine and sedative that is found in cough syrup, hydrocodone and a metabolite of hydrocodone, an anti-anxiety and sedative-type drug called Butalbital, and Tylenol.  Victim's blood tested positive for methamphetamine and norfluoxetine.

A different criminalist with the Department of Justice analyzed the anal swab taken from victim and found a low-level male DNA that was consistent with Alexander's DNA.  The criminalist also examined Alexander's swabs and found DNA that was consistent with victim's DNA.  A forensic analyst at the California Department of Justice analyzed the labial and anal swab taken from victim and compared them to swabs taken from Alexander.  The swabs were consistent with Alexander's DNA.  There was some ambiguity with the anal

United States District Court
Northern District of California

swab, and there was an indication that there may have been more than one male donor. The ambiguity could have been the result of contamination, but the forensic analyst was unsure of how that may have occurred.

District Attorney's Office Investigator Jorge Gutierrez obtained surveillance video footage near the 99 Cent store and the gas station, which were played for the jury. District Attorney's Investigator Peter Austen retrieved victim's cell phone records for April 15, 2017. The records reflected that victim's cell phone connected with the network near her storage unit and the 99 Cent Store. It was subsequently disconnected from the network and was not reconnected until the next day at approximately 1:00 p.m. near the library.

### f.  Dr. Mindy Mechanic's Testimony

Dr. Mindy Mechanic, a psychology professor, had spent the last 25 years specializing on the psychological consequences of trauma and victimization. Dr. Mechanic had never met victim. She clarified that her role was to help educate the jury because lay people often do not have accurate knowledge about how victims tend to respond to sexual assault.

Dr. Mechanic first testified about the effect that trauma generally has on the brain. In situations where an individual perceives danger, the prefrontal cortex, the part of the brain responsible for complex thought, decision-making, impulse control, planning, and logical and rational decisions, goes offline. In its place, the 'primitive and reptilian' part of an individual's brain goes online. As a result, during traumatic events, an individual typically displays responses like 'fight, flight and freeze.' It is only after the traumatic event has passed that an individual can look back and think about what he or she could have done differently. A person who has prior traumatic experiences is more likely to 'freeze' in traumatic situations and not fight. When the 'reptilian' part of the brain takes over, an individual can remember what they saw, heard, and experienced, but the 'verbal chronological narrative' does not function well during trauma. Trauma victims will often recount what happened in a disorganized way, and they may not recount the events in a linear fashion.

Dr. Mechanic explained that victims may behave in ways that 'defy ordinary logic and expectations.' There is a term called 'counterintuitive victim behavior' that describes ways that victims respond to traumatic events in a way that is not intuitive or obvious to most people.

When victims disclose what happened to them, they may recount things differently and may provide different details with each retelling. Disclosures are usually not perfectly consistent over time, and victims do not always tell

the entire story of what happened.  The victim may feel that they were somehow complicit in the assault, that they did something wrong, or that they can get in trouble for what they did.  Sexual assault is a 'humiliating, degrading, and shameful experience' that can affect a victim's disclosure. Victims can sometimes hold back details about an assault that they feel particularly embarrassed or ashamed of, such as engaging in anal sex.  Dr. Mechanic had never met a sexual assault victim who did not blame him or herself for being sexually traumatized.

Victims do not behave in a 'single universal pattern.'  Generally, it is expected that after an assault, a victim should seem 'really, really distressed and emotional and hysterical.'  Some victims may display those behaviors, but other victims may react differently and will 'shut down' and be 'numb.'  Other victims may behave as if everything is 'business as usual' in an attempt to restore control over his or her world.  Victims do not tend to flee from their assailant.  Sometimes victims are in a state of shock.  Victims may also comply without consenting to the assault.

Childhood sexual assault can cause developmental arrest, depression, post-traumatic stress disorder, suicidality, substance abuse, trust issues, and difficulty with intimate relationships.  It can also cause personality disorders. Dr. Mechanic opined that 'girls have a risk of becoming victims of sexual assault or domestic violence when they're teenagers or adults.'  Dr. Mechanic elaborated that '[i]t's about twice as likely if you have been a previous victim of childhood sexual trauma that in adulthood you'll be twice as likely then as someone who didn't have that experience to be sexually victimized again as an adult.'

Dr. Mechanic explained that one theory behind this pattern is that those who have been victimized as children may end up having 'faulty risk recognition detection systems' and are not able to detect that they are in danger of sexual assault.  Also, victims who already suffer from depression or post-traumatic stress disorder may make riskier decisions and have symptoms that 'interfere such that [the victim] end[s] up being victimized again.'  Victims that have not been successfully treated for their trauma may end up self-medicating and using substances that increases a person's risk of being sexually assaulted. Research also suggests that criminals are good at reading body language and detecting submissiveness in their chosen victims.

Those who have experienced childhood sexual trauma are less likely to fight back if they are victimized again as adults and are more likely to disassociate and be unaware of their surroundings.  They may also revert back to their prior assault and perceive that they are going through their original trauma.  They may even see the face of their original perpetrator.

United States District Court
Northern District of California

10

A childhood sexual assault victim whose perpetrator did not suffer any consequences for his or her actions may develop long-term feelings of mistrust and danger.  These feelings may lead childhood sexual assault victims to seek out people who victimize them because 'it's what they know' and there have been no clear indications that the assault was wrong or will not be tolerated.  Sometimes victims may even seek out similar types of assault experiences.

(Ans., State Appellate Opinion, Dkt. No. 30-21 at 4-16.)

As grounds for federal habeas relief, Alexander claims (1) there was insufficient evidence of force or fear to support the kidnapping conviction; (2) the trial court erroneously admitted irrelevant and prejudicial expert testimony; (3) the trial court failed to give a proper limiting instruction on the use of expert testimony; (4) his sentence violates the Eighth Amendment; and (5) the trial court gave flawed jury instructions regarding kidnapping.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

1
2
3
4
5
6
7
8
9

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

10

## DISCUSSION

11

### i.    Sufficiency of Evidence of Force or Fear

12
13
14
15
16
17

Alexander was convicted of kidnapping to commit oral copulation, rape, and sodomy under California Penal Code § 209(b)(1). (Ans., State Appellate Opinion, Dkt. No. 30-21 at 34.) "The jury also found true the special allegation that he kidnapped the victim and moving the victim substantially increased the victim's risk of harm." (*Id.*) The jury did <u>not</u> find true any of the deadly weapon enhancement allegations, including ones that he "used" or was "armed with" a deadly weapon. (*Id.* at 3, 16.)

18
19
20
21
22
23

Alexander claims that there was insufficient evidence of force or fear to support the kidnapping charge and the enhancement allegation that he kidnapped and moved the victim. (Second Am. Pet., Dkt. No. 20 at 5, 20-1 at 1-6.) Among other reasons, he alleges that because the jury found that he was not "armed" with a knife, there cannot have been evidence that he compelled the victim's movements with force or fear. (*Id.*, Dkt. No. 20-1 at 2.)

24
25

This claim was rejected on appeal because the state appellate court found sufficient evidence of force or fear:

26
27
28

Alexander observes that the jury did not find true the allegations that he was 'armed' with a knife during any of the charged offenses. Thus, he insists that substantial evidence does not support a rational inference that he used force or fear, requiring that we strike his kidnapping conviction and kidnapping

special allegations.

First, the fact that the jury did not find true the allegations that Alexander was armed with a knife did not mean that the jury found that Alexander was not in possession of a knife. With respect to sentence enhancements under section 12022, 'armed' with a firearm means that the defendant 'has the specified weapon available for use, either offensively or defensively.' (*People v. Bland* (1995) 10 Cal. 4th 991, 997.) At trial, victim testified that Alexander did not directly threaten her with the knife, and she thought she might have 'accidentally' seen it. The jury may have concluded that although Alexander possessed a knife or had a knife on his person, he did not have it available for his use.

Moreover, even in the absence of evidence that Alexander had a knife in his possession, victim's testimony provided substantial evidence that her movement was still accomplished by force or fear. Victim testified that Alexander, a stranger, opened her car door and sat in the front passenger seat. She also testified that he instructed her to drive. Victim reiterated that she was scared of Alexander multiple times during her testimony. When Alexander first asked victim to orally copulate him, Alexander told victim to '[s]uck [his] dick' and placed her hand on his penis. Victim testified that Alexander directed her to drive to various places, and, when she initially refused his attempt to sodomize her, he told her that they were going to do things his way. Victim testified that she did not know Alexander, and was afraid he would harm her because she did not know what he was capable of. Given victim's testimony, there was substantial evidence that her movement was accomplished by force because she reasonably feared she would be harmed by Alexander unless she complied with his demands. [Citation omitted.]

Alexander argues that there is no evidence that he knew victim, and as a result, he had no way of knowing about her childhood trauma, which may have made her more susceptible to acting under coercion. He insists that it is not enough to prove that victim was subjectively afraid of him; there must also be proof that her fear was the result of his actions. We find no merit in Alexander's argument. As described, Alexander engaged in numerous acts that reasonably instilled fear in victim. He got into her car, directed her to drive to deserted places, and forced her to engage in sex acts with him despite her refusal. Based on the evidence, the jury could reasonably infer that victim's fear directly arose from Alexander's acts.

Under these circumstances, we find substantial evidence supports Alexander's kidnapping conviction and special allegations.

(Ans., State Appellate Opinion, Dkt. No. 30-21 at 34-36.)

When reviewing a state court's conviction for sufficiency of the evidence, a federal court must determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted.  *Id.* at 324.  "[T]he only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality."  *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).  In addition to this highly deferential standard, a federal court must accord "considerable deference" to a state court's determination that there was sufficient evidence under *Jackson*.  *Id.*

A federal habeas court reviews a sufficiency of evidence claim "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16.  "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."  Cal. Penal Code § 207(a).  "[T]he force used against the victim need not be physical [under section 207(a)].  The movement is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he or she fears harm or injury from the accused and such apprehension is not unreasonable under the circumstances."  *People v. Majors*, 33 Cal.4th 321, 326-327 (Cal. 2004) (citation and quotation marks removed).

Sufficient evidence existed to support the jury's finding that force or fear was used. Alexander "engaged in numerous acts that reasonably instilled fear into the victim."  (Ans., State Appellate Opinion, Dkt. No. 30-21 at 36.)  He was a stranger who stepped into her car without invitation and wearing a six-inch hunting knife; ordered her to drive to various "deserted locations"; and compelled her to engage in sexual acts she clearly did not want

14

to engage in.[2]  The victim testified that she felt "scared," "afraid," "horrified," "terror[ized]," and "trapped" during the eight-hour ordeal.  (Ans., RT, Dkt. No. 30-8 at 88, 91, 100, 108.)  She testified that she was afraid of what Alexander might do if she sought help or fought back.  (*Id.* at 91, 161.)  "I didn't know if he was going to harm me physically or if he was going to hit me or stab me or what."  (*Id.* at 108.)  Furthermore, physical force was used.  Alexander burned her with a cigarette, and when victim refused to orally copulate him, he grabbed her hand and put it on his penis, then pulled her head and pushed it down.  (*Id.*, State Appellate Opinion, Dkt. No. 30-21 at 6, 9.)  On such evidence, the jury's finding that force or fear was used is not so insupportable that it falls below the threshold of bare rationality.  The state court's rejection of this claim was reasonable and is entitled to AEDPA deference.  This claim is DENIED.

ii.     **Admission of Expert Testimony**

Alexander claims that the trial court's admission of the expert testimony of Dr. Mechanic on the behavior of sexual assault victims violated his due process right to a fair trial.  (Second Am. Pet., Dkt. No. 20 at 5; Dkt. No. 23-3 at 1-3.)  He contends that the testimony was irrelevant, prejudicial, and vouched for the credibility of the victim.  (*Id.*)

Dr. Mindy Mechanic, a psychology professor, specializes in the psychological consequences of trauma and victimization.  (State Appellate Opinion, Dkt. No. 30-21 at 13.)  She testified at trial that she had never met the victim and "clarified that her role was to help educate the jury because lay people often do not have accurate knowledge about how victims tend to respond to sexual assault."  (*Id.*)  "Dr. Mechanic first testified about the general impact of trauma on victims, including the effect that trauma has on the brain and the emergence of the reptilian part of the brain when an individual is confronted by traumatic events.  She then testified about the counterintuitive behaviors of both sexual assault victims and childhood sexual assault victims."  (*Id.* at 20.)  The state appellate court concluded that the latter part of Mechanic's testimony is "is akin to evidence of rape

---

[2] Though Alexander was found not to have been "armed" with a knife, he still possessed one during the incidents.

1   trauma syndrome or child sexual abuse accommodation syndrome (CSAAS), which have

2   routinely been found admissible." (*Id.* at 21.)

3       The state appellate court rejected in part Alexander's claim of irrelevance: "Dr.

4   Mechanic's testimony was relevant to dispel misconceptions about why victim did not

5   fight back against Alexander or flee or call for help when she had the opportunity to do

6   so." (*Id.* at 22.) However, it did find that Mechanic's testimony regarding "the general

7   behavior of trauma victims and of how others may blame victims to reduce their own

8   feelings of vulnerability" was improperly admitted. (*Id.* at 29.) The subject was not

9   beyond a layperson's experience and the testimony "was not offered to explain victim's

10  behavior, nor was it relevant to victim's credibility, which was the primary issue at trial."

11  (*Id.* at 27.)

12      That said, there was no prejudice or unfair trial. Mechanic's testimony about

13  general behavior and blaming was "brief" and the evidence "was not particularly

14  prejudicial"; she testified that she never met the victim. The prosecutor repeated to the

15  jury that he was "not saying Dr. Mechanic says it happened. She absolutely didn't. She's

16  not part of the case." (*Id.* at 27-28.) Also, the evidence of Alexander's guilt was

17  "relatively strong": physical evidence, including DNA, "tied him to the victim";

18  surveillance camera footage "corroborated [the] victim's general chronology of the

19  assault"; and the victim told her mother and fiancée about what happened. (*Id.* at 28.)

20      "Under AEDPA, even clearly erroneous admissions of evidence that render a trial

21  fundamentally unfair may not permit the grant of federal habeas corpus relief if not

22  forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Holley*

23  *v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). So far, the Supreme Court "has not

24  yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence

25  constitutes a due process violation sufficient to warrant issuance of the writ." *Id.*; *see also*

26  *Walden v. Shinn,* 990 F.3d 1183, 1204 (9th Cir. 2021) (citing *Holley* when affirming the

27  district court's denial of a claim that the admission of "purportedly gruesome crime scene

28  and autopsy photos" violated due process); *Zapien v. Davis*, 849 F.3d 787, 794 (9th Cir.

United States District Court
Northern District of California

16

2016) (citing *Holley* when rejecting a claim that "the fundamental unfairness of admitting multiple hearsay testimony" violates due process).

Habeas relief is not warranted on this claim because there is no clearly established Supreme Court authority that the admission of irrelevant or prejudicial evidence is sufficient to justify issuance of the habeas writ. 28 U.S.C. § 2254(d)(1). Even if this was a cognizable claim, there was no prejudice. As the state appellate court found, the contested testimony was brief and "not particularly prejudicial." Mechanic testified that she had not met the victim, had not read any reports on the case, and that her role was to be an "educator" because "lay people and as well as professionals[] just don't have accurate knowledge about how victims respond to sexual assault." (Ans., RT, Dkt. No. 30-9 at 72.) The prosecutor made it clear that Mechanic was not saying that any sexual assault occurred: "She absolutely didn't." Furthermore, there was relatively strong evidence against Alexander, including DNA evidence and video footage that corroborated the victim's testimony regarding the sequence of events. The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. This claim is DENIED.

### iii.    Jury Instructions on Expert Testimony

Alexander claims that the trial court failed to instruct the jury against making impermissible inferences from Dr. Mechanic's testimony, similar to limiting instructions on the use of CSAAS (child sexual abuse accommodation syndrome).[3] (Second Am. Pet., Dkt. No. 20-5 at 2-3.) No request for such an instruction was made at trial. Alexander contends that the trial court had a duty to give such an instruction *sua sponte*. (*Id.*)

The state appellate court rejected this claim because there is a split of authority in California state courts on whether a trial court has a *sua sponte* duty to give such on an instruction. (Ans., State Appellate Opinion, Dkt. No. 30-21 at 31.) The claim was also

---

[3] Such an instruction would be that CSAAS evidence is "(1) admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (Ans., State Appellate Opinion, Dkt. No. 30-21 at 31.)

United States District Court
Northern District of California

likely forfeited because no request was made for the instruction.  And, significantly, any error was harmless.  (*Id.*)  Mechanic testified that she never met the victim; her testimony was "couched in general terms"; the prosecutor told the jury that Mechanic was not saying any sexual assault occurred; and the evidence of Alexander's guilt was relatively strong.  (*Id.* at 31-33.)  The state appellate court also rejected Alexander's claim that Mechanic's testimony relieved the prosecution of the burden of proof:  "Dr. Mechanic's testimony was largely aimed at dispelling some of the common misconceptions that jurors may have about the way that sexual assault and child sexual assault victims behave during traumatic events.  The prosecution was still required to prove lack of consent. As a result, the introduction of Dr. Mechanic's testimony did not deprive Alexander of due process in the absence of a limiting instruction."  (*Id.* at 33.)

Habeas relief is not warranted on this claim, even if Mechanic's testimony were erroneously admitted.  It follows that federal habeas relief is unavailable for a failure to give an instruction on such evidence.  And there was no prejudice or an unfair trial. Mechanic's testimony was on the general reactions of sexual assault victims, not with the victim's reactions.  Mechanic never met the victim or read anything about the case.  It cannot be inferred that her generalized testimony relieved the prosecution of any evidentiary burden or that it caused the jurors to make impermissible inferences.  The state court's rejection of this claim was reasonable and is entitled to AEDPA deference.  This claim is DENIED.

**iv.      Sentence**

Alexander claims his sentence of 175 years to life violates the Eighth Amendment. (Second Am. Pet., Dkt. Nos. 20 at 5; 20-4 at 2-3.)  This claim is both procedurally defaulted and meritless.

**a.       Procedural Default**

The state appellate court determined that Alexander had forfeited this claim because he failed to raise a contemporaneous objection in the trial court.  (Ans., State Appellate Opinion, Dkt. No. 30-21 at 47.)  Respondent correctly contends that this determination

1    renders this habeas claim procedurally defaulted.  (Ans., Dkt. No. 29-1 at 34.)

2         Alexander's claim is procedurally defaulted because he did not raise a

3    contemporaneous objection.  Federal courts "will not review a question of federal law

4    decided by a state court if the decision of that court rests on a state law ground that is

5    independent of the federal question and adequate to support the judgment."  *Coleman v.*

6    *Thompson*, 501 U.S. 722, 729 (1991).  Federal courts have recognized that California's

7    contemporaneous objection rule constitutes a valid basis for procedural default.  *See*

8    *Fairbank v. Ayers*, 650 F.3d 1243, 1256-57 (9th Cir. 2011).

9         To overcome a claim of procedural default, a petitioner must establish either

10   (1) cause for the default, and prejudice, or (2) that failure to consider the defaulted claims

11   will result in a "fundamental miscarriage of justice."  *Harris v. Reed*, 489 U.S. 255, 262

12   (1989).  Alexander fails to show cause or prejudice or evidence that a failure to consider

13   the claim will result in a fundamental miscarriage of justice.

14        The state court's rejection of this claim was reasonable and is entitled to AEDPA

15   deference.  This claim is DENIED.

16        **b.      Merits**

17        If the claim were not procedurally defaulted, it would be denied on the merits, as

18   the state appellate court ruled.  Even though "the practical effect" of Alexander's sentence

19   is a life sentence, he "cites to no cases that have found that a sentence is irrational and

20   constitutes cruel and unusual punishment if it exceeds the human lifetime and lengthy

21   prison sentences have been routinely found constitutional."  (Ans., State Appellate

22   Opinion, Dkt. No. 30-21 at 48-49.)  In fact, "far lengthier sentences have been found to

23   serve valid penological purposes."  (*Id.* at 49.)

24        A criminal sentence violates the Eighth Amendment if it is not proportionate to the

25   crime for which the defendant was convicted.  *Solem v. Helm*, 463 U.S. 277, 303 (1983).

26   But Eighth Amendment jurisprudence "gives legislatures broad discretion to fashion a

27   sentence that fits within the scope of the proportionality principle—the precise contours of

28   which are unclear."  *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003) (internal quotation marks

United States District Court
Northern District of California

and citations omitted).  "The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Ewing v. California*, 538 U.S. 11, 23 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)).  Where it cannot be said as a threshold matter that the crime committed and the sentence imposed are grossly disproportionate, it is not appropriate to engage in a comparative analysis of the sentence received by the defendant to those received by other defendants for other crimes.  *See United States v. Harris*, 154 F.3d 1082, 1084 (9th Cir. 1998).  Successful challenges to the proportionality of particular sentences are "exceedingly rare" outside "the context of capital punishment."  *Solem v. Helm*, 463 U.S. at 289-90.

In line with this authority, the Supreme Court upheld a life sentence without the possibility of parole for an offender whose sole felony conviction was for possessing 672 grams of cocaine.  *Harmelin*, 501 U.S. at 961, 994.  And in *Andrade*, under the highly deferential AEDPA standard, the Court upheld a sentence of two consecutive terms of 25 years to life for the nonviolent theft of $150 worth of videotapes.  538 U.S. at 77.

Accordingly, habeas relief is unwarranted.  Alexander was sentenced to 175 years to life for rape, kidnapping, and sodomy.  If, as in *Harmelin*, a life sentence for a single nonviolent drug possession conviction did not violate the Eighth Amendment, and if, as in *Andrade*, a sentence of 50 years to life for the nonviolent theft of videotapes also did not, then Alexander's lengthy sentence for kidnapping and rape also cannot.[4]  The state court's rejection of this claim was reasonable and is entitled to AEDPA deference.  If this claim were not procedurally defaulted, it would be DENIED on the merits.

**v.     Jury Instructions on Kidnapping**

Alexander claims that the jury instructions on kidnapping (CALCRIM No. 1203) were flawed.  He believes that language in the instruction ("in order to consent, a person

---

[4] Alexander alleges that the trial court imposed a sentence that was illegal under state law. (Second Am. Pet., Dkt. No. 20 at 5; Dkt. No. 20-4 at 2-3.)  Any error under state law is not remediable on federal habeas review, even if state law were erroneously interpreted or applied.  *See Swarthout v. Cooke*, 562 U.S. 216, 218-219 (2011).

United States District Court
Northern District of California

1  must act freely and voluntarily and know the nature of the act") would allow a juror to

2  conclude that he could be found guilty of kidnapping if he used fraud or deceit to trick the

3  victim into driving to any of the locations.  (Second Am. Pet., Dkt. No. 20-5 at 5-10.)  This

4  claim was rejected by the state appellate court.  Though it acknowledged that "asportation

5  by fraud alone" cannot constitute kidnapping under state law, it concluded that CALCRIM

6  No. 1203 "does not improperly suggest that fraud or deceit vitiates consent":

> As worded, CALCRIM No. 1203 instructed the jury that to find a defendant guilty of aggravated kidnaping, the victim must not 'consent to the *movement*,' and '[i]n order to consent, a person must act freely and voluntarily and know the nature of the *act*.'  (Italics added.)  Thus, the 'act' referred back to the 'movement' of the victim—in other words, the physical asportation . . . [Also,] the latter part of CALCRIM No. 1203 provided additional clarity by describing that a victim consented if he or she 'freely and voluntarily agreed to go with or be moved by the defendant,' 'was *aware* of the movement,' and had the sufficient mental capacity to choose to go with the defendant.  (Italics added.)

(Ans., State Appellate Opinion, Dkt. No. 30-21 at 39.)

Furthermore, the jury instructions must be considered as a whole and the court must "assume that jurors are capable of correlating all given jury instructions."  Many jury instructions, including No. 1203 (and Nos. 1215, 3175, 3179, and 3250), "all required the jury to find that the defendant used force or fear to move the victim in order to find the aggravated kidnapping charge of the kidnapping allegations to be true."[5]  (*Id.* at 40.)

To obtain federal collateral relief for errors in the jury charge, a petitioner must show the disputed instruction by itself so infected the entire trial that the resulting conviction violates due process.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  *Id.*  In other words, a federal habeas court must evaluate jury instructions in the context of the overall charge to the jury as a

---

[5] See CALCRIM No. 1215 (Ans., CT, Dkt. No. 30-2 at 198); No. 3175 (*id.* at 203); No. 3179 (*id.* at 204); and No. 3250 (*id.* at 207).

United States District Court
Northern District of California

component of the entire trial process.  *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

Habeas relief is not warranted here.  The state appellate court's determination that CALCRIM No. 1203 correctly presented state law binds this habeas court.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.)  And the state appellate court reasonably determined that the instructions were not susceptible to Alexander's interpretation.  The instructions (No. 1203 and others) repeatedly required the jury to find that Alexander used force and fear to accomplish the kidnapping.  An act of fraud or deceit is not sufficient — in fact, the "nature of the act" is the "movement," not some deceptive or tricky act.  The state appellate court's rejection of this claim was reasonable and is entitled to AEDPA deference.  This claim is DENIED.

## CONCLUSION

The state court's adjudication of Alexander's claims did not result in decisions that were contrary to, or involved an unreasonable application of, clearly established federal law, nor did they result in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, the petition is DENIED.

A certificate of appealability will not issue.  Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Alexander may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

The Clerk shall enter judgment in favor of respondent, and close the file.

**IT IS SO ORDERED.**

**Dated:**  June 14, 2024

WILLIAM H. ORRICK
United States District Judge